

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00296-CR

Mike **RAMOS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2019CR7828
Honorable Raymond Angelini, Judge Presiding

Opinion by:  Beth Watkins, Justice

Sitting:  Patricia O. Alvarez, Justice
Irene Rios, Justice
Beth Watkins, Justice

Delivered and Filed: May 22, 2024

AFFIRMED

Appellant Mike Ramos appeals his aggravated assault conviction on sufficiency of the evidence grounds. We affirm.

### BACKGROUND

On May 4, 2019, Ramos was driving east on Highway 90 with his wife Bertha Garcia and their one year-old daughter. According to Garcia, they were arguing when Ramos pulled to the shoulder and told her to get out of the car. There was no traffic, so Garcia took their daughter and

ran across the eastbound lanes, thinking she could "jump . . . the cement wall" median and someone could pick her up and take her in the other direction.

When Ramos realized Garcia had run across the highway, he turned his car west and parked in the middle eastbound lane, blocking traffic. A passerby named Cheryl Smith was at the front of the stopped eastbound traffic. Smith rolled down her window and asked Garcia if she needed help. Garcia ran to Smith's car and got in the front passenger seat, holding her daughter. Garcia asked her to lock the door and call 9-1-1.

Before they could drive away, Ramos left his car and tried to get in Smith's car; he was "determined to get inside." When he slipped and fell, Smith sped off and called 9-1-1. Ramos got back in his car, turned around, caught up to Smith's car and struck it, forcing it against the guardrail. Smith hit the brakes and, after regaining control of her car, exited and pulled into a gas station where they met police officers who responded to the 9-1-1 call. Neither Smith nor Garcia were injured. Officers later accompanied Garcia to retrieve her other children from Ramos's mother's house, where they saw Ramos's wrecked car and arrested him.

Ramos was charged with aggravated assault with a deadly weapon. At his jury trial, the State called both Garcia and Smith, as well as the responding officers. The State presented the recording of the 9-1-1 call and several photographs of the extensive damage to both cars.

Ramos testified in his own defense. He explained that he and Garcia were not arguing; rather, Garcia was crying while talking on the phone. When she ended the call, he asked her what was wrong. She told him that she could not be with him anymore. He was distraught. He pulled to the right shoulder and asked her to get out. He admitted that doing so "was a mistake." When he saw her run across the highway towards the westbound traffic, he "did a 180" to stop "all three lanes of traffic" so Garcia could "come across the highway back to safety."

When Garcia got into a car that was inching past his "barricade," he ran to that car and "started banging on the window"—he thought Garcia was risking her life by getting in a stranger's car. He told the jury that the driver "pushed on the gas and hit [him] with the car," knocking him down. He stood up, got in his car, turned around, and followed that car because he "wanted to know who she had jumped in the car with" and "to check if she was okay." He honked to get the driver's attention, startling the driver. Once he saw that the driver was a woman, he felt more comfortable so he passed them and left.

He testified he was about to miss his exit. He was driving in the middle lane and "took the exit from the middle lane . . . going kind of fast." He hit gravel, lost control of his car, and crashed into the concrete barrier. He testified:

> The only time that Cheryl Smith's car made contact with my car was when she wedged herself between me and that other car that I was telling you about that had came up when she had passed my -- my barricade. She wedged herself in there. And that's how she got those damages that she was talking about because there -- those damages don't consist of damages that -- from any crash.

He said the crash heard on the 9-1-1 recording was him crashing into the embankment.

After hearing competing versions of the incident, the jury convicted Ramos of aggravated assault. Ramos pled true to a single enhancement, the jury found the enhancement allegation true, and it assessed his punishment at twenty years' confinement. The trial court sentenced Ramos to the punishment assessed by the jury and Ramos appealed.

**ANALYSIS**

### Sufficiency of the Evidence

Ramos argues the evidence is insufficient to prove he intentionally or knowingly threatened Smith with imminent bodily injury.

*Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). Under that standard, we examine all the evidence in the light most favorable to the verdict and resolve all reasonable inferences from the evidence in the verdict's favor to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Nowlin v. State*, 473 S.W.3d 312, 317 (Tex. Crim. App. 2015). "[N]o evidence is ignored because the standard requires a reviewing court to view all of the evidence in the light most favorable to the verdict." *Cary v. State*, 507 S.W.3d 750, 759 n.8 (Tex. Crim. App. 2016) (internal quotation marks and emphasis omitted). "An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018). Rather, "[a] court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Id*. This rationality requirement is a key and explicit component of the *Jackson* sufficiency standard. *See Jackson*, 443 U.S. at 319.

"By its nature, a culpable mental state must generally be inferred from the circumstances." *Romano v. State*, 610 S.W.3d 30, 35 (Tex. Crim. App. 2020). "We cannot read an accused's mind, and absent a confession, we must infer his mental state from his acts, words and conduct." *Id*. In determining the sufficiency of the evidence to show an actor's intent, and faced with a record that supports conflicting inferences, we presume the trier of fact resolved any conflict in favor of the verdict it rendered, and we defer to that resolution. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

*Application*

A person commits assault by "intentionally or knowingly threaten[ing] another with imminent bodily injury[.]" TEX. PENAL CODE ANN. § 22.01(a)(2). A person commits an aggravated

assault by committing an assault and "us[ing] or exhibit[ing] a deadly weapon during the commission of the assault." TEX. PENAL CODE ANN. § 22.02(a)(2). A "deadly weapon" includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B). Assault by threat is a conduct-oriented offense, "focusing upon the act of making a threat, regardless of any result that threat might cause." *Landrian v. State*, 268 S.W.3d 532, 536 (Tex. Crim. App. 2008).

Here, the indictment alleged:

> on or about the 4th Day of May, 2019, MIKE RAMOS, hereinafter referred to as defendant, did use and exhibit a deadly weapon, NAMELY: A MOTOR VEHICLE, THAT IN THE MANNER OF ITS USE AND INTENDED USE WAS CAPABLE OF CAUSING DEATH AND SERIOUS BODILY INJURY, and defendant did intentionally and knowingly THREATEN IMMINENT BODILY INJURY to CHERYL SMITH, hereinafter referred to as complainant, by DRIVING SAID DEADLY WEAPON AT AND IN THE DIRECTION OF THE COMPLAINANT[.]

Ramos argues: "The question in this case is not whether [his] vehicle was a deadly weapon in the manner it was used. The question is whether the State proved beyond a reasonable doubt that [he] intentionally and knowingly threatened imminent bodily injury to Ms. Smith." To support this argument, he points to:

- Smith's testimony that she was scared Ramos was going to hurt Garcia and the child, not that she was scared that Ramos was going to hurt her;

- Smith's testimony that Ramos operated his car in a reckless manner;

- Smith and Garcia's testimony that they were not injured;

- the ambiguity of Smith's testimony that she, herself, was scared;

- the lack of testimony that Ramos acted or looked threatening or angry; and

- Ramos's testimony that he chased Smith's car to check if Garcia was safe.

But other evidence demonstrating that Ramos struck Smith's car with his own car and pushed her car into the guardrail while "he was still on the gas" is sufficient to support an inference he acted with the requisite intent. Despite Ramos's argument to the contrary, Smith testified that Ramos acted and looked threatening or angry. She testified that when Ramos came to her car on foot, "[h]e looked like he wanted to hurt someone." She then raced off, "doing about 65." When he caught up to her as they were driving, she was frightened:

> Q. Okay. What did you think was going to happen?
>
> A. I thought he was going to grab her and injure them. The way he looked at me like he didn't care who I was, he didn't care anything about me and he looked at me. When he looked at me, our eyes locked for a few seconds. And he hit me.
>
> Q. And that's when you were going 65 miles per hour?
>
> A. Yes, ma'am.
>
> Q. Okay. So it scared you a little bit?
>
> A. Oh, yes.
>
> Q. Okay. Were you worried that something really bad was going to happen?
>
> A. Yes, most definitely.
>
> Q. To you?
>
> A. To me, to everyone in the car.

She also testified:

> I looked up, and he was coming right at me, looking at me like he was intending to hit me. And he hit me and pushed my car over. And I was trying to control the car because we could -- up against the rail, and I hit my brakes -- you could hear the screeching and [I] broke away from him. And he went all across -- and I took off.

She explained that after the incident "I was traumatized. For four months, I didn't drive." Smith's perceptions of the threat constitute circumstantial evidence that Ramos intentionally or knowingly threatened Smith with imminent bodily injury. *See Olivas v. State*, 203 S.W.3d 341, 345 (Tex.

Crim. App. 2006) (Texas's assault by threat statute "does not explicitly indicate whether the intended victim must perceive or receive the threat"); *In re S.B.*, 117 S.W.3d 443, 450 n.2 (Tex. App.—Fort Worth 2003, no pet.) (noting that perception of threat is circumstantial evidence that defendant acted with requisite intent).

The jury also heard and saw other evidence supporting its finding of intent: photographs of the extensive damage to both cars; an officer's testimony the women were "nervous" and "frantic" afterwards; and the recording of the 9-1-1 call which, in real time, captured the crash, with screams and Garcia yelling "he just ran into us." In addition, the jury heard Garcia's testimony: that the incident started with Ramos pushing her to the door of his car and telling her to "F-ing get off the car"; that he yelled at her from outside Smith's car not caring "if he was going to break the window," scaring both Garcia and Smith; and that he chased them and slammed Smith's car "towards the rail," leaving her shocked and scared. *See Smith v. State*, 316 S.W.3d 688, 695–96 (Tex. App.—Fort Worth 2010, pet. ref'd) (evidence defendant intentionally struck victims' truck two or three times with his own truck after chasing it down at a high speed sufficient to support inference defendant acted with intent to threaten victims with imminent bodily injury).

The evidence regarding Ramos's conduct and the surrounding circumstances sufficiently supports the jury's inference that Ramos acted with intent to threaten Smith with imminent bodily injury. *Nowlin*, 473 S.W.3d at 317; *Smith*, 316 S.W.3d at 695–96. We therefore overrule Ramos's sole argument on appeal.

## CONCLUSION

Having overruled Ramos's sole issue, we affirm the judgment of the trial court.

Beth Watkins, Justice

DO NOT PUBLISH